UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF FLORIDA

Case No. _____– Civ (Judge's Last Name/Magistrate's Last Name)

20cv60961 WPD

FILED BY _____ D.C.

MAY 1 4 2020

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - FT. LAUD.

LEE P SHAPIRO,

Plaintiff

vs.

TRUIST FINANCIAL CORPORATION,

Formerly known as

Branch Banking & Trust Company (BB&T),

now known as

Truist Financial Corporation

and

Lisa Lebron, former Sales Service Leader for BB&T,

Currently known as

Truist Financial Corporation

Defendant(s)

## COMPLAINT

Plaintiff, LEE P SHAPIRO, acting in a pro se capacity, hereby sues

Defendants, TRUIST FINANCIAL CORPORATION FORMERLY KNOWN

As Branch Banking & Trust Company (BB&T), now known as

Truist Financial Corporation and Lisa Lebron, Sales Service

Leader for BB&T, now employed with Truist Financial

Corporation and alleges:

## JURISDICTION AND VENUE

1. Jurisdiction of this Court is invoked pursuant to the complaints involving federal statutes and laws.

2. Defendant's facility where Plaintiff was employed is located within the jurisdiction of the United States District Court for the Southern District of Florida, Fort Lauderdale Florida Division.

## PARTIES

3. Plaintiff, LEE SHAPIRO (hereinafter "Plaintiff" or "SHAPIRO""), is a citizen of the State of Florida and is legally competent to handle his own affairs.

4. Branch Bank & Trust now known as Truist Financial Services ( Truist ) is a corporation whose principal address and corporate  headquarters are in Charlotte North Carolina, with a large number of facilities nationwide, including but not limited to the facility where Plaintiff was employed, located at 1834 W Hillsboro Blvd. Deerfield Beach, Florida 33442 Broward County, Florida

5. Truist (formerly Branch Banking & Trust Company, also known as BB&T), at all material times conducted and continues to conduct business in Broward County, Florida.

6. Defendant Truist is engaged in the financial services industry and has had fifty (50) or more employees for each working day in each of twenty (20) or more weeks in the current or preceding calendar year.

## BACKGROUND

7.  June 8, 2008 Defendant Truist hired Shapiro as a Branch Manager (various titles of his job changed during his employment with BB&T, now Truist, but his title was Vice President Community Banking Market Leader IV during the period covering this complaint).

8. Shapiro performed his duties as a Financial Center Manager/ Community Banking Market Leader IV for over 11 years for Branch Banking & Trust Company, aka BB&T, and is now known as Truist Financial Services. He managed the West Hillsboro Financial Center for his entire employment with BB&T nka Truist, and in or around September 2013 until February of 2019, he became a "Cluster" market leader (which meant he was managing two financial centers) and also concurrently managed the 101 N Federal Hwy Deerfield Beach Fl. financial center. Additionally, he also had responsibility for the "10th Street and Military Trail" Financial Center's deposits and clients, when it was merged in to his financial center in or around June of 2018.   Therefore, in essence at one period of time he was actually managing three financial centers.

10. During his employment with Defendant BB&T/Truist, Shapiro received ONLY positive Annual and Semi-Annual performance evaluations, was consistently awarded pay raises and was overall an excellent employee. Only until Lisa Lebron Sales and Service Leader for BB&T became Mr. Shapiro's Boss in early 2018, did he begin to receive any type of performance corrective actions neither verbal or written, during his entire tenure with BB&T/Truist.

(Copies of the performance evaluations are kept electronically and can be obtained from the Human Sytems/Human Resources department upon request)

I, Lee P Shapiro, "Shapiro", plaintiff, in the above styled cause, sue defendant(s): Truist and Lisa Lebron.

This action is with respect to the allegations covered by the accompanying Laws below:

## GENERAL ALLEGATIONS AND FACTS PROVIDING PROOF

### 6. Violation of the Age Discrimination in Employment Act of 1967, (Pub. L. 90-202) (ADEA), as amended, as it appears in volume 29 of the United States Code, beginning at section 621.

February 7, 2020, the EEOC issued a Right-To-Sue Letter to Mr. Shapiro with respect to his claims of Age Discrimination under the ADA Amendments Act of 2008. (Exhibit 2).

Mr Shapiro had always received favorable annual and semi-annual reviews, until Ms Lebron became his direct supervisor in or around the beginning of 2008. Mr Shapiro in his 11 plus years at BB&T/Truist had never received any corrective action warnings, neither verbal or written, but under Ms Lebron's direct supervision had been given two verbal and three written warnings (Exhibits X, Z, Y, and Q).

Mr. Shapiro provided rebuttals to all of the corrective action warnings, as he could prove with facts (Exhibits C, I, Y, T, O, E) that the data contained in these corrective action performance warnings, was false and contrived.

The Negative ratings and corrective actions began in early 2018. Ms Lebron rated Shapiro a "Meets Expectations" status on his 2018 annual review (Exhibit Y). However, oddly Ms Lebron rated him below expectations on several categories within the review.

In the past, when Mr Shapiro received the overall performance rating of a meets or exceeds expectations, there were never any negative comments contained within.

These below expectations ratings did not make sense or have merit. As an example, Mr Shapiro was given a below expectations on his productivity category, even though he received a bonus in 2018, BECAUSE OF HIS PRODUCTIVITY.

Another odd rating was that he received a negative below expectations comment on this review with respect to the leadership category (Exhibit Y), but her comments in the Summary section of the review said he was "well suited in his position".

These comments on the review also were totally opposite of the responsibilities he was given in his position: he was given three branches to manage at one time, his staff was loyal and had been with him since he became manager, he was given problem employees to manage and provide a

safe haven (as they could not co-exist in other branches and requested a transfer to his financial center).

Another insensitive and odd comment Ms Lebron constantly told Mr Shapiro was that his personal situation was not unique and that many people go through what he went through. This was in response to when on January 19, 2017, Mr Shapiro suddenly and tragically lost his wife of 37 years to cancer only ten days after being admitted in the hospital. Her death catapulted his daughter in to a downward spiral of substance abuse, with several overdose attempts, and the necessity of him to be primary caregiver for his grandson as well as manage his daughter's recovery.

Ms Lebron, who was well aware of his personal situation, commented about this on his 2018 review, stating that although he endured this personal tragedy, his personal and work balance needed to improve.  (Exhibit C)

During her tenure as Mr Shapiro's boss, he was never offered any official promotions for the additional duties she had asked him to take on, yet he was told he was lacking in certain key qualities that market leaders should possess (mentioned in his 2018 review, as well as in the performance corrective actions that followed).

IN 2019, BB&T announced a merger with SunTrust Bank. The atmosphere was very tense, as with all mergers, the employees of both merging companies were not sure of their future with the new organization that would be formed.

Most of the newer market leaders that had been hired to replace retiring or fired market leaders at BB&T in the last few years from 2017 forward, were much younger than Mr Shapiro.

In Early 2018, Mr Shapiro began noticing that Ms Lebron was blatantly treating him differently in market leader meetings whether they were held on the phone, Webex, or in person. Her behavior was condescending, rude, demeaning, unprofessional, her responses were short, authoritative, and her tone was angry. She denied a request to purchase a $4.00 ethernet cable to run Mr Shapiro's laptop computer, necessary for use in his position. He could not work without it.

She accused him of always taking off Fridays as sick days during the 2018 calendar year. (Exhibit C, EMAIL dated May 29, 2019 outlines the entire situation)

This behavior prompted Mr Shapiro to arrange a meeting to see why this is taking place, and to see if this treatment could end. He contacted Ms Kelly Bilancione the Regional Associate Relations Manager, as her position would be the correct objective mediator needed to moderate this meeting. Ms Bilancione refused to conduct the meeting, saying that she did not perform this function (even though BB&T procedure mentioned her role as one of the people to see in such a situation). She suggested arranging the meeting with Ms Lebron himself. He did this and after a market leader meeting, he and Ms Lebron met to discuss her treatment of him.
Mr. Shapiro did not waste any time at the meeting and immediately asked Ms Lebron why she was treating him differently than the other market leaders she managed, and she did not hesitate,

answering that she believed that Mr Shapiro was lying when he said he was on business calls away from the financial center. She told him she did not believe he was doing what his reports said. He told her immediately that she was completely incorrect, he was a very hard worker, and further replied that if this were true, she would have discovered concrete proof, and he would have been fired by now.

In conclusion of the meeting Mr Shapiro asked Ms Lebron if this "cleared the air". She replied, NO! (Exhibit C, EMAIL dated May 29, 2019 outlines the entire situation)

Other examples of her discriminatory treatment toward him included but were not limited to:

- Levying a verbal warning to him for being absent on June 22, 2018, because on May 4, 2018 (Exhibit X) he texted his absence notification to her, rather than verbally calling her. There was no formal procedure set up to notify everyone in her region of her preference to be called until 6 months later in a memo to her entire team (Exhibit W January 9, 2019 email to all of her Market Leaders) Why was I being singled out and given a verbal warning in my personnel file on June 22, 2018, for a policy not instituted until January 9, 2019. The BB&T policy and procedure manual specifically states that an absence or tardiness notification need must be communicated in a manner previously established by the manager. This was not.

- Placing Shapiro on written warning (Exhibit Q) March 6, 2018, for buying lunch for the staff located at 101 N Federal Hwy, Deerfield Beach Fl 33442, in an effort to thank them for their service, telling him he was offering an employee cash. This is not true and as the employees knew that Mr Shapiro was there to buy them lunch with the money given to Lauren Berlin. This Branch Banker called corporate investigations to accuse Mr Shapiro of offering her money. Ms Berlin was placed on final corrective action by Mer Shapiro for her performance and other policy violations and was very angry at Mr Shapiro. Furthermore, there is no policy which prohibits Mr Shapiro from buying lunch for his team.

- Mr Shapiro was also admonished in the March 6, 2019 written warning for not communicating his absences from prior discussions according to the policy she set up. However, there were no further instances of Mr Shapiro violating her procedure of notification preference to be noted in this written warning, and BB&T Policy (Exhibit X) indicates that it is acceptable for an employee to have latitude in the communication of these occurrences if it involves the illness of the employee or person he is a caregiver for.

- Mr Shapiro's 2018 Annual review rated him as Meets Expectations (Exhibit Y), but Ms. Lebron incorrectly stated that I only attended one market leader meeting, and that attendance at these meetings was his job responsibility. Exhibit I proves this completely wrong with Kelly Bilancione Regional Associate Relations manager, confirming that it is false in this exhibit's email.

- 32 hours of available vacation and sick time was taken away by Ms Lebron, who forced Shapiro to deduct 1, 2, and 4 hours from this time that he used to take care of appointments for his daughter and her personal issues, as well as attending to the needs of his grandson, who he had

pre-need care of (Exhibit I). This deduction was improper according to the Fair Labor Standards Act Wage and Hour division (Exhibit E) section 541.602, 603 and 604).  To the best of his knowledge no other Market Leader had to deduct time for being one to two hours late for personal appointments or matters.

- These incidences led him to believe Ms Lebron was trying to force his exodus from the bank and was trying to provide evidence convey to him that he was too old to do the job. Mr Shapiro knew that his productive performance contributed to the portion of the region under her direct control. He knew he contributed a great deal to her regional success, and was told in his 2018 review (Exhibit C). Therefore he thought that if she wanted him to succeed she would have been the one to arrange the meeting long before it reached this combative state, and that she would have been anxious to get this matter behind them so he could concentrate on him being as productive as possible, to continue his contribution to her regional success.  The behavior she was exhibiting was more geared to wanting him gone from the company.

When Mr. Shapiro finally requested to retire, his boss Lisa Lebron forced him to take an earlier retirement date than he had planned (Exhibit C).

Plaintiff, Lee P Shapiro, reasserts and reaffirms the allegations of Section 6 further states that this is an action against Truist for violation of the Age Discrimination in Employment Act (ADEA), as amended, 29 U.S.C.

At all times relevant to this action, Shapiro was an employee within the meaning of 29 U.S.C. §630(f), 29 U.S.C. §6232 and 29 U.S.C. §631.

When Shapiro retired from his employment with BB&T on October 18, 2019, he was 7 days short of being sixty-three (63) years old.

At all times relevant to this action, Shapiro was an individual covered by the ADEA, 29 U.S.C. §631(a), in that Shapiro was at least forty (40) years of age.

Defendant, Truist (BB&T then) at all times relevant to this action, had twenty (20) or more employees for each working day in each of twenty (20) or more calendar weeks in the current or preceding calendar year.

Defendant Truist was, at all times relevant to this action, an employer and/or Shapiro's employer within the meaning of 29 U.S.C. §§623 and 630(b).

Defendant Truist, with the aid and assistance of Ms Lisa Lebron knowingly and willfully discriminated against Shapiro because of his age, in violation of 29 U.S.C. §623(a)(1), so as to discourage Shapiro, from continuing his employment with the company and risking further corrective action including termination and loss of his retirement benefits and pension from the company, decided to retire on October 18, 2019

Moreover, Defendant Truist treated employees who were less than forty (40) years old and had less or similar qualifications as Shapiro, not disciplining or terminating other employees who often committed similar or far worse actions in the workplace than that which Shapiro had supposedly committed and for which he was accused of and summarily placed on several different verbal and written warnings of corrective action.

Furthermore, despite the fact that Shapiro had over 11 years with the company, a history of positive performance evaluations, was consistently awarded pay raises, was overall an excellent employee, because of Shapiro's age, in violation of the Age Discrimination act, Shapiro's age was a motivating factor in the Defendants' actions forcing him to retire before he had ever intended to.

Defendant's violations of the ADEA were and continue to be willful and intentional.

Shapiro has suffered and continues to suffer loss of earnings, emotional distress, loss of self-esteem and other injuries as a direct result of Defendant's violations of the ADEA.

## 7. Violation of the Religious Discrimination Act of 1964 with respect to requiring employers to reasonably accommodate the religious beliefs and practices of applicants and employees. business.

A reasonable religious accommodation is any adjustment to the work environment that will allow the employee to practice his religion. Flexible scheduling .......is an example of accommodating an employee's religious beliefs.

The Defendant BB&T/Truist scheduled Market Leader Meetings on the Yom Kippur Jewish Holiday in 2018, and again in 2019. (Exhibit W)

Mr Shapiro's 2018 Annual review rated him as Meets Expectations (Exhibit Y), but Ms. Lebron incorrectly stated that I only attended one market leader meeting, and that attendance at these meetings was his job responsibility. Exhibit I proves this completely wrong with Kelly Bilancione Regional Associate Relations manager, confirming that it is false in this exhibit's email.

Additionally, although it was proven that I only missed two market leader meetings for illness, the 2018 review was not changed to correct Ms Lebron's error.

On or around August 16, 2019, Mr Shapiro had been placed on a final written warning (exhibit Q) for absences on July 19,22, 23,24, 31, and August 1,2, 9, and 15.

As Mr Shapiro stated in the final warning; All of these absences were necessary to care for personal issues with his daughter and child care issues with his grandson.

However, The Final written noticed stated that any further unacceptable job performance could result in termination.

Prior to this Shapiro had submitted an application for FMLA status on the 6th of August, 2019 (exhibit D), but it wasn't until September 24, 2019 that it was approved.

32 hours of available vacation and sick time was taken away by Ms Lebron, who forced Shapiro to deduct 1, 2, and 4 hours from this time that he used to take care of appointments for his daughter and her personal issues, as well as attending to the needs of his grandson, who he had pre-need care of (Exhibit I). This deduction was improper according to the Fair Labor Standards Act Wage and Hour division (Exhibit E) section 541.602, 603 and 604).

Shapiro had no vacation or sick time available to observe the October 9, 2019 Yom Kippur Jewish Holiday.

As stated above, there was a Market Leader meeting scheduled on Yom Kippur, October 9, 2019. If Shapiro missed this meeting, he would be subject to further corrective action and possibly terminated.

In order to be able to observe the Jewish high holiday of Yom Kippur, he was forced to schedule surgery in the morning of October 9, 2019 to remove a cancerous tumor on his ear, then he was able to attend religious services in the afternoon.

The Market Leader Meeting, was a "fun" trip to Key West. This was not the usual venue, but Shapiro felt management would require him to attend and failure to do so may bring additional corrective action or termination.

Not only was the meeting scheduled two years in a row on Yom Kippur, there were no accommodations made available to Mr Shapiro to observe the holiday. On the contrary, obstacles were made which made it very difficult for him to observe this holiday.

To the best of his knowledge, he was the only Jewish Market Leader.

The deduction of this available time, created a situation where Mr Shapiro had no time available for other needed time off. This resulted in a series of escalated corrective actions levied against Mr Shapiro for this reason. Then when time was needed to accommodate the Jewish Holiday, he had none available.

The above factual information proves that the Defendant Truist (formerly BB&T) did not provide the accommodations necessary for Mr Shapiro to observe the Yom Kippur Jewish holiday, thus violating the religious discrimination act.


**8. Unlawful treatment of workers with caregiving responsibilities, also known as family responsibilities discrimination, protects those under the Americans with Disabilities Act, The Family Medical Leave Act, and Title VII of The Civil Rights Act.**

Mr Shapiro meets the definition of caregiver for his daughter (Exhibit X) and for his grandson (for whom he has pre need guardian authority, Exhibit A).

Ms Lebron continuously told Mr Shapiro that many people go through the same caregiving situation as he was going through, minimizing the importance of his role to his children, adopting an attitude that in her mind diminished the importance of his role since his wife died, thereby causing her to be reluctant to provide him the leeway and flexibility to accomplish his responsibilities of the role. Further Ms Lebron penalized Mr Shapiro for taking this time to fulfill the caregiver role.

Mr Shapiro was still continuing to grieve after his wife of 37 years died very suddenly from cancer. He was also coping with, and aiding in the recovery of his daughter's substance abuse, which had spiraled out of control, requiring him to save her from death by overdose three times. He had to Marchman act her three times, ejected her from the household, and became the primary caregiver for his grandson. He was acting in the role of his father, prior to his wife passing away, but now with the passing of his wife, who was 4 and half years old, he was the sole parent and caregiver.

Mr Shapiro and his grandson attended sessions at Tomorrow's Rainbow, a children's grief counseling group, specifically aimed at helping children deal with the loss of a loved one (Exhibit B1). Christopher, Mr Shapiro's grandson, was very close to his grandmother, loved her dearly, and this group of children with similar circumstances helped him cope with the loss.

The counselors at Tomorrow's Rainbow emphasized that everyone grieves differently, and there is no set way, nor any right way to grieve. Any and all ways are okay and acceptable. This applies to children as well as adults. Therefore, Ms Lebron's comments to Mr Shapiro minimizing his loss and the situation he was dealing with, cannot be compared to anyone else.
NO ONE HANDLES THE DEATH OF A LOVED ONE IN THE EXACT SAME MANNER. MORE IMPORTANTLY EACH PERSON'S INDIVIDUAL WAY TO GRIEVE IS PERFECTLY OKAY. THERE IS NO CORRECT/RIGHT WAY TO HANDLE GRIEF. DIFFERENT STAGES OF GRIEF CAN BE COMMON, BUT PEOPLE MAY EXPERIENCE THESE STAGES IN DIFFERENT SEQUENCES, OR NOT AT ALL.  THE GRIEF PROCESS CAN BE LONG OR SHORT, BUT THE PROCESS ITSELF CANNOT BE SUMMARILY DISMISSED AWAY BY SAYING TO SOMEONE, "I KNOW MANY PEOPLE THAT HAVE GONE THOUGH THE SAME SITUATION". THIS COMMENT TO MR. SHAPIRO IS INCENTIVE AND CONVEYS HER INTENT TO MINIMIZE THE PROCESS, SUGGEST THAT OTHERS WENT THROUGH THIS, WHY CAN'T YOU, WHAT IS WRONG WITH YOU, YOU'RE MAKING A MOUNTAIN OUT OF A MOLE HILL, AND HURRY UP YOU'RE TAKING TOO LONG.

BY TRYING TO MAKE MR SHAPIRO'S SITUATION THAT HE ENDURED SEEM AS SOMETHING THAT EVERYONE GOES THROUGH, SHE WAS DISCRIMINATING AGAINST HIM, MAKING A GENDER BIASED STEREOTYPE, ON HOW A MAN IS SUPPOSED TO BEHAVE AND ASSUME THAT HE IS NOT A GOOD FATHER IF HE HAS TO WORK PART TIME TO BE ABLE TO CARE FOR HIS CHILDREN (Exhibit X)

This is discrimination ( Exhibit X) according to the Family and Medical Leave Act  which protects both men and women who need to care for a child, The Americans with Disabilities Act which prevents discrimination against those who provide care to disabled family members, and Title

VII of the Civil Rights Act which prevents discrimination on the basis of any sex stereotypes and it applies to both men and women. This means that an employer cannot deny leave or penalize a man for taking care of his children because "that is something a wife should do". (Exhibit X) Employees who make their caregiving responsibilities known on the job to their employers should be allowed a more flexible work schedule, and not be subject to retaliation for his caregiver responsibilities.  Ms Lebron placed Mr Shapiro on verbal and written corrective action for taking care of his family (Exhibit E) Ms Lebron docks his available sick and vacation time, (Exhibit X) 2018 Verbal Warning dated June 22, 2018 for absences and tardiness (tardy for an exempt employee that works over 50 hours a week , (Exhibit Z) 2018 Mid Year Review dated 8-23 -18 mentioning his time away from the office affecting his performance, although he achieved excellent performance with respect to his goals and bonused because of his performance in 2018. , (Exhibit Y) 2018 Annual Review, rating him below expectations on several values and core competencies that Mr Shapiro had never been rated below on. These comments were odd considering his overall rating was "Meets Expectations". The below expectations rating on Judgement, Knowledge Communication, Leadership, was innapropriate since these are what the company based their decision to give him the helm of two and then three financial centers to manage. Also the annual review indicated that his sales excellence was strong and inspiring, and that he contributes to the success of the regional performance (Exhibit T, 2019 Verbal Warning, dated 3-4-19, Exhibit Q, 2019 Written Warning dated 5-7-19, and Final Written Warning dated approximately September of 2019, for absences due to caregiving).

Ms Lebron is making an unlawful refusal to modify his duties and allow him to take his children to appointments and therapy sessions. It is also a form of Sexual Discrimination, and a violation of Title VII of the Civil Rights act of 1964, assuming that this role should be handled by a female caregiver. This is a violation of Title VII, by telling the male employee, Mr Shapiro that she is denying him the right to care for his children, and penalizing him by docking his available sick and vacation pay, as a penalty (Exhibit E). Further penalization came in the form of performance documentation for missing days in order to fulfill his caregiver responsibilities Exhibit T, Q, and Y).

The above factual information proves that the Defendants discriminated against Mr Shapiro in his caregiver role.


### 9. Improper handling of the deduction of available vacation and sick time for an exempt employee, as detailed in the Fair Labor Standards Act, governed by the Department of Labor Wage and Hour Division section 541.602, 541.603 and 541.604.

 Mr Shapiro's available vacation and sick time was deducted for appointments and other obligations he was responsible for in providing care to his children for whom he was the sole caregiver (Exhibit E shows that his deductions amounted to 32 hours of vacation and sick time that was deducted from January 9, 2019, through June 21, 2019)

The time Mr Shapiro took off was not for sick time or disability.

According to the Fair Labor Standards Act, Wage and Hour Division sections 541.602, 541.603, and 541. 604. (Exhibit E) Mr Shapiro was exempt from being paid overtime and an hourly wage because he met the exemption test for the Executive Exemption: He was a salaried employee, who made at least $684.per week, who's primary duty was to manage a department or unit of the company, and regularly direct the work of at least two or more other full time employees, and have the authority to recommend or suggest the hiring and firing of employees.

This exemption is lost if the employee has deductions from his compensation for time taken off from work that is not related to sick time or disability, is less than one full day, and this deduction is done repeatedly, and/or after the employee complains about it.

Mr Shapiro had 32 hours of available sick time and vacation time deducted from his use, which could have been used later to offset the days he took in July, that he was written up for, or to be used to offset the Yom Kippur Holiday time off in which he had to schedule a surgery to have the time off.  This offset would have prevented him from being written up on corrective action.

Loss of the exemption then compels the employer to pay the employee and others like him/her to be paid an hourly wage including overtime for hours worked in excess of the 40 hours per week.

Mr Shapiro complained about this to Kelly Bilancione in his grievance for unfair treatment in the workplace, and nothing was done about it. (Exhibit C).

The above factual information proves that the Defendants violated the Fair Labor Standards Act, by improperly handling the deduction of available vacation and sick time.

## 10. Violation of the Family Medical Leave Act §825.119 (Exhibit D)

(b).... An employee may also take FMLA leave to care for a covered family member who is receiving treatment for substance abuse. The employer may not take action against an employee who is providing care for a covered family member receiving treatment for substance abuse.

(d) *Son or daughter.* For purposes of FMLA leave taken for birth or adoption, or to care for a family member with a serious health condition, son or daughter means a biological, adopted, or foster child, a stepchild, a legal ward, or a child of a person standing in loco parentis, who is either under age 18, or age 18 or older and "incapable of self-care because of a mental or physical disability" at the time that FMLA leave is to commence.

(1) *Incapable of self-care* means that the individual requires active assistance or supervision to provide daily self-care in three or more of the activities of daily living (ADLs) or instrumental activities of daily living (ADLs). Activities of daily living include adaptive activities such as caring appropriately for one's grooming and hygiene, bathing, dressing and eating. Instrumental activities of daily living include cooking, cleaning, shopping, taking public transportation, paying bills, maintaining a residence, using telephones and directories, using a post office, etc.

825.124   Need to care for a family member or covered servicemember.

(a) The medical certification provision that an employee is needed to care for a family member or covered servicemember encompasses both physical and psychological care. It includes situations where, for example, because of a serious health condition, the family member is unable to care for his or her own basic medical, hygienic, or nutritional needs or safety, or is unable to transport himself or herself to the doctor. The term also includes providing psychological comfort and reassurance which would be beneficial to a child, spouse or parent with a serious health condition who is receiving inpatient or home care.

(b) The term also includes situations where the employee may be needed to substitute for others who normally care for the family member or covered servicemember, or to make arrangements for changes in care, such as transfer to a nursing home. The employee need not be the only individual or family member available to care for the family member or covered servicemember.

(c) An employee's intermittent leave or a reduced leave schedule necessary to care for a family member or covered servicemember includes not only a situation where the condition of the family member or covered servicemember itself is intermittent, but also where the employee is only needed intermittently—such as where other care is normally available, or care responsibilities are shared with another member of the family or a third party. *See* §§825.202-825.205 for rules governing the use of intermittent or reduced schedule leave.

825.220   Protection for employees who request leave or otherwise assert FMLA rights.

(c) The Act's prohibition against interference prohibits an employer from discriminating or retaliating against an employee or prospective employee for having exercised or attempted to exercise FMLA rights. For example, if an employee on leave without pay would otherwise be entitled to full benefits (other than health benefits), the same benefits would be required to be provided to an employee on unpaid FMLA leave. By the same token, employers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions; nor can FMLA leave be counted under no fault attendance policies.

Mr Shapiro was placed on final Written Warning (Exhibit Q), because he took time off to take care of his family. He was written up for this, and subsequently he was approved for FMLA status. (Exhibit D), This time off that he was written up for should have been covered under the FMLA approval for time taken to care for his family. The final written warning should have been reversed, as these absences were the reason he applied for the FMLA status, and should have been covered under the approval.

The above factual information proves that the Defendants violated the Family and Medical Leave Act.

11. **From 2018 through October of 2019, Defendant BB&T allowed Lisa Lebron Sales and Service Manager to create a hostile the violation of their own internal Harassment and Discrimination policies, page 8 and 9 of their 2019 Policy and Procedure Manual.**

They allowed Defendant Lisa Lebron to create a hostile work environment for Mr. Shapiro who she continuously harassed intimidated and directed treatment toward that was completely different than how his peers were treated.  (Exhibit C).

Ms. Lebron utilized false untrue data and accusations to manifest the hostile environment as well as levying a series of verbal and written performance documentations placing his employment in jeopardy as the process escalated to the final written warning levied against Mr Shapiro on or around the end of August and the Beginning of September, 2019.

The best way to present the history of this unfair treatment for which Mr Shapiro is filing this specific complaint of the violation of the companies own internal policy on harassment and discrimination as well as Ms Lebron's hostile aggressive campaign to remove Mr Shapiro from his position, is to paraphrase a series of emails that are available for scrutiny in Exhibit C.

These emails unveil and reveal in detail the entire series of harassment and discrimination behaviors directed toward Mr Shapiro which violate BB&T policies, committed by and the responsibility of both Defendants.

They also provide factual evidence that Ms Lebron produced false data as well as exaggeration and the fabrication of scenarios that did not take place, purposefully placing Mr Shapiro in a negative guilt-ridden status, totally void of any truth, for the sole purpose of processing him out of a position.

In response to Ms Lebron's continued campaign to efforts to discredit and remove him from his position within the bank, she exaggerated any negative data that may have affected Mr. Shapiro or manifested completely false information to suit her needs. Mr Shapiro quickly and routinely submitted rebuttal responses, either on the actual review or corrective action, or sent via emails to BB&T personnel that he felt should have knowledge of her activities. His correspondence of rebuttals contained the actual factual evidence to disprove her accusations and charges, as well as some verbiage showing that she actually violated BB&T's own internal policies and procedures, as well as Federal Laws protecting employees (e.g. Age, Religious, and Caregiver discrimination, improper procedures that violate the Fair Labor Standards Act with respect to the Wage and Hour Division statutes, and FMLA). (Exhibit C, D, E, T, Q, Y, O, I)

This final corrective action levied against Mr Shapiro showed him that the allowance of these behaviors to have credibility and weight, he had better retire before he might be terminated.

To add insult to injury, he was not even allowed to retire on the date he finally decided would be the most beneficial and suited to his personal financial position (Exhibit C October 12, 2019 email to Kelly Bilancione). Lisa Lebron forced him to take a retirement date almost one month prior to his desired and approved date (Human Resources approved his choice of date for Mr Shapiro's retirement on September 19, 2019, but Lisa Lebron over-rode this date  two weeks later in a memo delivered by Kelly Bilancione to Mr Shapiro).

Mr Shapiro filed a new grievance of unfair treatment in the workplace on September 4, 2019, after the first grievance was found to be without merit on August 19, 2019. (Exhibit C September 4, 2019 email). Mr Shapiro was requesting this grievance to be reviewed by an independent mediator. However, feeling that this second grievance request would not be acted upon by the company, on September 6, 2019, Mr Shapiro requested to retire from the company on December 31, 2019

In fear of being terminated if his request for FMLA was denied, on September 17, 2019, he changed his retirement date to October 18, 2019, on month as required by the policy and procedure manual, as the minimum amount of time to formally request to retire, as an officer of the bank.

However, when the FMLA was approved, and he new he could not be fired for taking time to care for his children, he changed the date to November 15, 2019, as it best fit his financial situation. This is when the November date was denied.

On September 17, 2019, Mr Shapiro also sent out his first request for a settlement, to compensate him for the unfair treatment he endured in the workplace (Exhibit C), and called it a Severance offer. This offer was based on all of the unfair treatment he endured which is he basis of this suit.

The offer was denied. However, it is another excellent synopsis of all of the violations of the Federal Laws committed by Ms Lebron against Mr Shapiro.

Although the emails in Exhibit C, provide factual evidence to prove harassment in the workplace, violation of BB&T's own harassment policies, responses to all of the verbal and written corrective actions which provide facts that disprove them as being true, and exposing the false data used to levy them against Mr Shapiro, below is a list of some of the more blatant examples of the hostile and unfair treatment in the workplace, Mr Shapiro was subject to:

- Denial of Mr Shapiro's ordering of an ether net cable to connect his laptop to the Insite website of BB&T.

- Placing Mr Shapiro on a written warning May 7, 2019 for buying lunch for the staff of the branch he had managed for over five years. The corrective action was motivated by an employee of final written warning, placed there by Mr Shapiro. She filed a complaint that Mr Shapiro was offering her money. This employee was on corrective action for lying, and now they believed her. Corporate investigations was called out to question Mr Shapiro and with Lisa Lebron's backing Mr Shapiro was placed on a written warning for this gesture of kindness.

- On September 10, 2019, Lisa Lebron brought Corporate investigations to Mr Shapiro's financial center, after supposedly auditing his sales files and finding that he did not actually go on 4 calls. Ms Lebron lectured Mr Shapiro for 10 minutes on the violation of getting credit for something he did not do. She told Mr Shapiro that he was missing 4 Financial Insight write-ups. Mr Shapiro told Ms Lebron he would never take credit for something he did not do, and then asked to go in to his office to access his computer. He came out to seconds later with the call reports she said he was missing. They were in his files as he keeps track of everything he does. She did not apologize. He was the only Market leader audited. (Exhibit R)

- Lisa Lebron Admonished Mr Shapiro in an email dated January 9th, 2019 for using the Happy Face Imogee after successfully completing the documentation requirements for a business client that took over two months to obtain. She wrote that it was inappropriate. (Exhibit I)

- Lisa Lebron wrote in the Annual 2018 performance review that I only attended 1 market leader meeting that year. Exhibit Actually, I only missed two meetings for illness. Kelly Bilancione confirmed this fact, yet it was not removed from the review. (Exhibit Y)

- As directed by the BB&T policy and procedural manual, if an employee felt that they were the victim of unfair treatment in the workplace, they are immediately to contact either their supervisor, their supervisor's supervisor, or the regional associate relations manager. Given that Mr Shapiro was filing the grievance against his direct supervisor, and although was directed by Kelly Bilancione to go to Lisa Lebron's boss, Aaron Patience, Mr Shapiro decided to submit the grievance to Kelly Bilancione. Regional Associate Relations Manager for BB&T. She became the mediator and handled the grievance submitted by Mr Shapiro for unfair treatment in the workplace on May 7 of 2019. However, she was to prove that she was unable to act in an objective manner as she also assisted Lisa Lebron in the construction and implementation of the verbal and written corrective actions against Mr. Shapiro.

The above factual information proves that Truist Allowed for and Ms Lisa Lebron, created and continued hostile behavior, establishing and maintaining an unfair workplace for Mr Shapiro, which is illegal. Also Illegal is the retaliatory behavior by Ms Lebron, when he filed the grievance internally through BB&T to stop this behavior (Exhibit C).

WHEREFORE, Plaintiff, Lee P Shapiro demands judgment against Branch Banking & Trust Company (BB&T), now known as , n/k/a, Truist Financial Services, for three and a half years of compensation, as he would not have retired until her reached the age of Sixty-Six (66), equitable relief including but not limited to interest, attorney's fees, costs and such other and further relief as this Honorable Court deems proper.

Mr. Shapiro demands a trial by jury regarding the resolution of these complaints.

Dated: May, 13, 2020

Respectfully submitted,

Lee P Shapiro

**3734 Pebblebrook Manor**

**Coconut Creek Florida 33073**

**Telephone:(954) 857-5763**

**EMAIL: Tyke0902@gmail.com**